UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BETSABÉ MONTOYA and BLANCHE PESCE, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ING LIFE INSURANCE AND ANNUITY COMPANY, a Connecticut corporation; NEW YORK STATE UNITED TEACHERS; NEW YORK STATE UNITED TEACHERS MEMBER BENEFITS TRUST, a New York not-for-profit trust; IVAN TIGER, trustee of New York State United Teachers Member Benefits Trust; RODERICK SHERMAN, trustee of New York State United Teachers Member Benefits Trust; LEE CUTLER, trustee of New York State United Teachers Member Benefits Trust; KATHLEEN M. DONAHUE, trustee of New York State United Teachers Member Benefits Trust; RICHARD C. IANNUZZI, trustee of New York State United Teachers Member Benefits Trust; ALAN B. LUBIN, trustee of New York State United Teachers Members Benefits Trust; JOSEPH P. MCLAUGHLIN, trustee of New York State United Teachers Member Benefits Trust; ARTHUR PEPPER, trustee of New York State United Teachers Member Benefits Trust; ELLEN SCHULER MAUK, trustee Of New York State United Teachers Member Benefits Trust; GARY TERWILLIGER, trustee of New York State United Teachers Member Benefits Trust; JOHN DOE DEFENDANTS 1-99, and JANE DOE DEFENDANTS 1-99, trustees of New York State United Teachers Member Benefits Trust, <br><br> Defendants. | ECF Document <br><br> No. 07 CV 2574 (NRB) <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)** |

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................1

II. JURISDICTION AND VENUE.........................................................................................5

III. PARTIES ...........................................................................................................................6

    A.    Plaintiffs...................................................................................................................6

    B.    Defendants ...............................................................................................................6

IV. THE PLAN .......................................................................................................................8

    A.    Nature of the Plan ...................................................................................................8

        1.    NYSUT and NYSUT Trust Established and Maintained a
Plan as a Result of their Extensive Involvement in the
Operation, Management, and Administration of the Plan .......................8

        2.    NYSUT's and NYSUT Trust's Exclusive Endorsement
Scheme Demonstrates NYSUT's and NYSUT Trust's
Substantial and Meaningful Involvement in the
Management and Administration of the Plan .........................................11

V. ERISA REQUIREMENTS ..............................................................................................14

VI. DEFENDANTS' FIDUCIARY STATUS .......................................................................18

    A.    NYSUT's, NYSUT Trust's, and the Individual Defendants'
Fiduciary Status ...................................................................................................19

    B.    ING's Fiduciary Status .........................................................................................21

VII. DEFENDANTS' IMPROPER CONDUCT ....................................................................22

    A.    NYSUT, NYSUT Trust, and ING Breached their Duties of
Prudence and Loyalty through their Exclusive Endorsement
Scheme...................................................................................................................22

    B.    Defendants Breached their Fiduciary Duties under ERISA by
Charging Excessive Fees and Failing to Adequately Monitor the
Plan to Ensure that it was in the Best Interests of Plan Participants.....................27

    C.    ING Engaged in an Improper Revenue Sharing Kickback Scheme
with Investment Advisors .....................................................................................29

    D.    Defendants Failed to Provide Complete and Accurate Information
to Plan Participants Regarding Endorsement Fees Paid to NYSUT
Trust and Revenue Sharing Kickback Fees Paid to ING.......................................33

VIII. CAUSES OF ACTION..................................................................................................35

IX. CLASS ACTION ALLEGATIONS ...............................................................................47

X. PRAYER FOR RELIEF ..................................................................................................49

## I. INTRODUCTION

1.     This is a class action brought by Plaintiffs Betsabé Montoya and Blanche Pesce on behalf of themselves and other participants and beneficiaries of the ING Opportunity Plus and Opportunity Independence programs (the "Plan"), section 403(b) tax deferred annuity programs established and maintained by Defendant New York State United Teachers Member Benefits Trust ("NYSUT Trust"), an arm of Defendant New York State United Teachers ("NYSUT"), for the benefit of NYSUT members. The annuities offered under the Plan were issued by Defendant ING Life Insurance and Annuity Company, and its predecessor Aetna Life Insurance and Annuity Company (referred to collectively herein as "ING"). This case is brought pursuant to sections 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) & (a)(3), against the fiduciaries of the Plan for violations of ERISA.

2.     From June 1989 through December 31, 2006, NYSUT Trust exclusively endorsed the Plan. Plaintiffs, together with at least 53,000 other NYSUT Members, enrolled in the Plan. NYSUT Members invested over $2 billion in the Plan.

3.     The Plan is purported to be a § 403(b) retirement plan. Section 403(b) of the Internal Revenue Code ("section 403(b)" or "403(b)") provides for a tax-deferred retirement savings program for certain teachers and employees of charitable organizations. Under section 403(b), individuals can save for retirement by establishing annuity accounts and designating that portions of their salaries be invested therein.

4.     As with any retirement plan, a section 403(b) plan is considered an "employee pension benefit plan" as that term is defined by ERISA, and, thus, subject to ERISA, if it is

established or maintained by an employer or employee organization.   ERISA § 3(2)(A),
29 U.S.C. § 1002(2)(A).

5.     NYSUT and NYSUT Trust, employee organizations, through their extensive
involvement in the set-up, management, and administration of the Plan, established and
maintained the Plan.

6.     Specifically, NYSUT and NYSUT Trust engaged in an elaborate "exclusive
endorsement" scheme whereby NYSUT Trust was paid millions of dollars by ING to market and
promote the program directly to NYSUT members.

7.     NYSUT's and NYSUT Trust's involvement in the Plan was substantial and far-
reaching.   NYSUT and NYSUT Trust selected ING as the "exclusively endorsed" 403(b)
provider, worked directly with ING to design the Plan and determine the benefits offered by the
Plan, communicated extensively with Plan participants regarding the Plan and Plan assets, and
vigorously promoted the Plan for its own financial gain and to the detriment of Plan participants.
ING reimbursed NYSUT Trust for the salaries of certain employees of NYSUT Trust whose jobs
were to promote the Plan to NYSUT members while appearing to be disinterested NYSUT
employees.   NYSUT Trust and ING used the trust and confidence reposed in it by the NYSUT
members to further their own economic interests through the establishment and maintenance of
the Plan.

8.     As a result of NYSUT's and NYSUT Trust's substantial and meaningful
involvement in the management, administration, and operation of the Plan, and NYSUT Trust's
receipt of millions of dollars of compensation for such involvement, the Plan constitutes an
employee benefit Plan under ERISA.   Accordingly, ERISA's stringent fiduciary duties and
prohibitions against self-dealing applied to the Plan and its fiduciaries.

9.      Plaintiffs are members of NYSUT who participated in the Plan.

10.     Defendants are:  (a) NYSUT; (b) NYSUT Trust, which was established in 1983 by NYSUT for the purpose of endorsing and monitoring competitive insurance plans, investments, and benefit programs for NYSUT members; (c) the Trustees of NYSUT Trust ("Individual Defendants"); and (d) ING, which managed and administered the Plan with NYSUT Trust (collectively "Defendants").  Through their actions, Defendants functioned as ERISA fiduciaries with respect to the conduct at issue in this lawsuit.

11.     Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets as required by ERISA § 404(a), 29 U.S.C. § 1104(a), during the period June 1, 1989 to December 31, 2006 (the "Class Period").  Plaintiffs also allege that Defendants engaged in self-dealing that constituted prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

12.     Specifically, Plaintiffs allege in Count I that NYSUT Trust and the Individual Defendants breached their fiduciary duties to the Plan participants under ERISA § 404(a), 29 U.S.C. § 1104(a), by failing to conduct an adequate investigation of the merits of the Plan; by exclusively endorsing the Plan in exchange for the payment of millions of dollars by ING notwithstanding the fact that the Plan was substantially more expensive than comparable plans that were readily available in the marketplace; and by failing to provide complete and accurate information to participants regarding the Plan, the reasons for its endorsement, and the fact that it was not in the best interests of NYSUT members.  The excessive costs of the Plan as compared with the lower cost equivalents resulted in tens of millions of dollars of lost retirement savings for NYSUT members.

13.     Plaintiffs allege in Count II that ING breached its fiduciary duties under ERISA § 404(a), 29 U.S.C. § 1104(a), by charging excessive and unreasonable fees that materially reduced Plan participants account balances; by failing to provide complete and accurate information regarding Plan fees and expenses, and by engaging in self-dealing through undisclosed revenue sharing schemes with mutual funds, mutual fund advisors and other investment advisors ("Investment Advisors") whose funds are offered to Plan participants by ING. Investment Advisors paid ING to have their funds appear in the menu of options offered to Plan participants. These payments created impermissible conflicts of interest. Despite its fiduciary and other duties to Plan participants, ING selected funds based on the payments it would receive rather than an objective and prudent evaluation of the merits of the funds and the best interests of Plan participants. ING's selection of high-cost funds instead of widely known and available low-cost, high-quality alternatives substantially diminished Plan participants' retirement savings.

14.     Plaintiffs allege in Count III that ING engaged in prohibited transactions under ERISA § 406, 29 U.S.C. § 1106, through its revenue sharing scheme with Investment Advisors. ERISA prohibits the transfer of plan assets to, or the use of plan assets by, or for the benefit of, parties in interest. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1). By engaging in revenue sharing kickbacks with Investment Advisors through which Plan assets were used directly and indirectly by ING for its own benefit, ING violated ERISA § 406, 29 U.S.C. § 1106, and related provisions of ERISA.

15.     In Count IV, Plaintiffs allege that Defendants breached their fiduciary duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management and to provide complete and accurate communications.

16.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 & 502(a)(2), 29 U.S.C. §§ 1109 & 1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other equitable relief.

17.     As a matter of substantive law, ERISA §§ 409(a) & 502(a)(2), 29 U.S.C. §§ 1109(a) & 1132(a)(2), authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty.  An appropriate procedural vehicle to assert such claims is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and Plaintiffs bring this action as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

## II.  JURISDICTION AND VENUE

18.     **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

19.     **Personal Jurisdiction.**  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

20.     **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or may be found in this district.

## III. PARTIES

### A.      Plaintiffs

21.      Plaintiff Betsabé Montoya is a resident of Long Beach, New York.  Plaintiff Montoya has been a member of NYSUT since 1990.  During the Class Period, she was employed by the Long Beach City School District.  Plaintiff Montoya began participating in the Plan in 1996, and has deposited over $100,000 into the Plan since that time.

22.      Plaintiff Blanche Pesce is a resident of Rockville Center, New York.  Plaintiff Pesce has been a member of NYSUT since 1993.  During the Class Period, she was employed by the Long Beach City School District.  Plaintiff Pesce began participating in the Plan in 1994, and has deposited over $100,000 into the Plan since that time.

### B.      Defendants

23.      **Defendant NYSUT.**  NYSUT is an employee organization comprised of approximately 575,000 people who work in, or are retired from, New York's schools, colleges, and healthcare facilities.  According to information presented on NYSUT's website, NYSUT is a federation of more than 1,200 local unions.  NYSUT established NYSUT Trust and provides offices and other resources to NYSUT Trust in order to assist NYSUT Trust with regard to its substantial involvement in the operation, administration, and management of the Plan.

24.      **Defendant NYSUT Trust.**  NYSUT Trust is a trust established in 1983 by NYSUT for the purpose of endorsing and monitoring insurance plans, investments, and benefit programs for NYSUT members.  As set forth in more detail below, NYSUT Trust, through its substantial involvement in the operation, administration, and management of the Plan, established and maintained the Plan as those terms are defined by ERISA.

25.    **Individual NYSUT Trustee Defendants.**   On information and belief, NYSUT Trust is managed by its Board of Trustees.   The members of the Board of Trustees during the Class Period included:

    (a)    Defendant Ivan Tiger;

    (b)    Defendant Roderick P. Sherman;

    (c)    Defendant Lee Cutler;

    (d)    Defendant Kathleen M Donahue;

    (e)    Defendant Richard C. Ianuzzi;

    (f)    Defendant Alan B. Lubin;

    (g)    Defendant Joseph P. McLaughlin;

    (h)    Defendant Arthur Pepper;

    (i)    Defendant Ellen Schuler Mauk;

    (j)    Defendant Gary Terwilliger; and

    (k)    John Doe Defendants 1–99 and Jane Doe Defendants 1–99, the identity of whom are unknown to Plaintiffs at this time.

26.    **Defendant ING.**   ING is a corporation organized and existing under the laws of the State of Connecticut.   On December 13, 2000, ING became the successor entity to Aetna Life Insurance and Annuity Company.   ING is engaged in the business of marketing and selling retirement products to retirement plans, including 401(k) plans, 403(b) variable annuity plans, and 457(b) deferred compensation plans.

## IV. THE PLAN

A.    **Nature of the Plan**

      1.    **NYSUT and NYSUT Trust Established and Maintained a Plan as a Result of their Extensive Involvement in the Operation, Management, and Administration of the Plan**

      27.    With limited exceptions not applicable here, ERISA applies to "any employee benefit plan if it is established or maintained-(1) by any employer engaged in commerce or in any industry or activity affecting commerce; or (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or (3) by both." ERISA § 4(a), 29 U.S.C. § 1003(a).

      28.    Pursuant to ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), the terms "employee pension benefit plan" and "pension plan" mean:

> . . . any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program –
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

      29.    The term "employee organization" means any labor union or any organization of any kind, or any agency or employee representation committee, association, group, or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning an employee benefit plan, or other matters incidental to employment relationships; or any employees' beneficiary association organized for the purpose in whole or in part, of establishing such a plan. ERISA § 3(4), 29 U.S.C. §1002(4).

30.    Here, the Plan provides retirement income to employees and results in a deferral of income by employees for a period extending to the termination of covered employment or beyond. Thus, the Plan is an employee pension benefit plan as that term is defined by ERISA.

31.    Furthermore, NYSUT is an employee organization engaged in commerce or an activity affecting commerce as those terms are defined by ERISA. NYSUT is a labor union comprised of persons who work for or retired from New York state schools, colleges, and healthcare facilities. NYSUT Trust is an arm of NYSUT and an agent thereof. NYSUT Trust has staff located at NYSUT headquarters in Albany as well as several of NYSUT's Regional Offices across the state. Each Regional Office has a Member Benefits representative either housed at the office or visiting the office during the course of each month for the purpose of providing service to local leaders and to individual members. Moreover NYSUT Trust is an employees' beneficiary association organized for the purpose in whole or in part of establishing a plan through its involvement and participation in providing retirement and other benefits for NYSUT members.

32.    Finally, surrounding circumstances demonstrate that NYSUT and NYSUT Trust established or maintained the Plan as a result of NYSUT's and NYSUT Trust's involvement in the set up and operation of the Plan. Specifically, such involvement included:

(a)    NYSUT and NYSUT Trust selected ING as the exclusively endorsed 403(b) provider for NYSUT members;

(b)    NYSUT and NYSUT Trust received millions of dollars of compensation in order to exclusively endorse the Plan, thereby creating an atmosphere of trust and confidence that was exploited by NYSUT, NYSUT Trust, and ING for their financial gain and to the detriment of Plan participants;

- 9 -

(c)      NYSUT and NYSUT Trust worked in conjunction with ING to set up and design the Plan, evaluate investment options to ensure participants were provided with appropriate options, monitor and oversee the Plan, and address participant complaints regarding the Plan;

(d)      NYSUT and NYSUT Trust communicated extensively with Plan participants regarding the Plan, Plan assets, and Plan benefits, endorsed the Plan, and in conjunction with ING aggressively marketed and promoted the Plan; and

(e)      NYSUT and NYSUT Trust employed "coordinators" whose salaries (unbeknownst to Plan participants) were paid by ING, and who (unbeknownst to Plan participants) functioned as agents of ING for the purpose of marketing and promoting the Plan and causing Plan participants to invest their retirement savings in the investment options offered through the Plan.

33.      NYSUT's and NYSUT Trust's involvement in the Plan was exhibited by its close working relationship with ING throughout the Class Period, and by the substantial compensation and financial incentives paid by ING to NYSUT Trust.

34.      Based on the surrounding circumstances, a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits with respect to the Plan. This information was provided in Plan materials and documents prepared and issued by NYSUT, NYSUT Trust, and ING. Accordingly, NYSUT and NYSUT Trust established and maintained an employee pension benefit plan under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

2. **NYSUT's and NYSUT Trust's Exclusive Endorsement Scheme Demonstrates NYSUT's and NYSUT Trust's Substantial and Meaningful Involvement in the Management and Administration of the Plan**

35.     The Department of Labor ("DOL") has clarified by regulation the statutory phrase "established or maintained by an employer" As set forth in 29 C.F.R. § 2510.3-2(f), under the following circumstances, an employer is not deemed to have established an employee pension benefit plan:

(1) Participation is completely voluntary for employees;

(2) All rights under the annuity contract or custodial account are enforceable solely by the employee, by a beneficiary of such employee, or by any authorized representative of such employee or beneficiary;

(3) The sole involvement of the employer, other than pursuant to paragraph (f)(2) above, is limited to any of the following:

(i) Permitting annuity contractors (which term shall include any agent or broker who offers annuity contracts or who makes available custodial accounts within the meaning of section 403(b)(7) of the Code) to publicize their products to employees;

(ii) Requesting information concerning proposed funding media, products or annuity contractors;

(iii) Summarizing or otherwise compiling the information provided with respect to the proposed funding media or products which are made available, or the annuity contractors whose services are provided, in order to facilitate review and analysis by the employees;

(iv) Collecting annuity or custodial account considerations as required by salary reduction agreements or by agreements to forego salary increases, remitting such considerations to annuity contractors and maintaining records of such considerations;

(v) Holding in the employer's name one or more group annuity contracts covering its employees;

(vi) Before February 7, 1978, to have limited the funding media or products available to employees, or the annuity contractors who could approach employees, to those which, in the judgment of the employer, afforded employees appropriate investment opportunities; or

(vii) After February 6, 1978, limiting the funding media or products available to employees, or the annuity contractors who may approach employees, to a number and selection which is designed to afford employees a reasonable choice in light of all relevant circumstances. Relevant circumstances may include, but would not necessarily be limited to, the following types of factors:

(A) The number of employees affected,

(B) The number of contractors who have indicated interest in approaching employees,

(C) The variety of available products,

(D) The terms of the available arrangements,

(E) The administrative burdens and costs to the employer, and

(F) The possible interference with employee performance resulting from direct solicitation by contractors; and

(4) *The employer receives no direct or indirect consideration or compensation in cash or otherwise other than reasonable compensation to cover expenses properly and actually incurred by such employer in the performance of the employer's duties pursuant to the salary reduction agreements or agreements to forego salary increases described in this paragraph (f) of this section.*

(Emphasis added).

36.    The regulation distinguishes between plans in which the sponsor is minimally involved and neutral as to the Plan such that its activities are ministerial in nature, and plans in which the sponsor meaningfully and substantially participates in the administration or management of the plan. Where an employer offends the ideal of employer neutrality through its level of involvement in the Plan, the Plan is subject to ERISA.

37.    The regulation provides useful guidance as to the circumstances under which an *employee organization* will be found to have established an employee pension benefit plan. Since, by way of example, an employer establishes or maintains a plan if it receives

compensation in connection with the plan, it stands to reason that the same conduct by an employee organization will cause the employee organization to establish or maintain a plan.

38.      NYSUT and NYSUT Trust did not limit themselves to the type of ministerial activity set forth by the DOL in 29 C.F.R. § 2510.3-2(f).  To the contrary, Defendants engaged in the precise type of conduct that establishes a plan under ERISA, namely:

- NYSUT Trust received millions of dollars from ING as the *quid pro quo* for NYSUT's exclusive endorsement of the Plan, which constitutes direct compensation from ING;

- the compensation far exceeded any actual expenses properly and actually incurred by NYSUT Trust in performance of NYSUT Trust's duties pursuant to the salary reduction agreements or agreements to forego salary increases;

- the compensation was not by any stretch "reasonable" given the amount of the endorsement payments and the actual costs incurred by NYSUT Trust.

39.      NYSUT and NYSUT Trust were not mere conduits of information in the selection, operation, or administration of the Plan, but rather were closely, actively, and substantially involved in establishing and maintaining the Plan, promoting the Plan to NYSUT members, and aggressively seeking for their and ING's pecuniary gain participation in the Plan by NYSUT members.

40.      For the foregoing reasons, the Plan is not exempt from ERISA, and, instead, is an employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

## V. ERISA REQUIREMENTS

41.     ERISA was enacted to protect, *inter alia*, "the interests of participants in employee benefit plans and their beneficiaries." ERISA § 2(b), 29 U.S.C. § 1001(b).

42.     An employee benefit plan, including the Plan here, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

43.     ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description ("SPD"). ERISA §§ 102(a) & 104(b), 29 U.S.C. §§ 1022(a) & 1024(b).

44.     ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury. ERISA §§ 103 & 104, 29 U.S.C. §§ 1023 & 1024; I.R.C. § 6058(a).

45.     The assets of an employee benefit plan, such as the Plan, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). In addition to the preceding ERISA requirements, none of which was satisfied by Defendants, the following ERISA provisions are relevant to this lawsuit.

46.     ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1) states "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

47.     Notwithstanding exemptions set forth in ERISA § 408, 29 U.S.C. § 1108, none of which are applicable here, ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and "parties in interest." Specifically, ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides:

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

> (A)  *sale or exchange, or leasing, of any property between the plan and a party in interest*;

> (B)  lending of money or other extension of credit between the plan and a party in interest;

> (C)  *furnishing of goods, services, or facilities between the plan and a party in interest*;

> (D)  *transfer to, or use by or for the benefit of a party in interest, of any assets of the plan*; or

> (E)  acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

(Emphasis added).

48.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides:

A fiduciary with respect to a plan shall not—

> (1) deal with the assets of the plan in his own interest or for his own account,

> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

49.    ERISA defines a "party in interest" to an employee benefit plan, in relevant part, as:   (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan; (B) a person providing services to such plan; (C) an employer any of whose employees are covered by such plan; and (D) an employee organization any of whose members are covered by such plan.   ERISA § 3(14), 29 U.S.C. § 1002(14).

- 15 -

50.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

51.     ERISA § 409(a), 29 U.S.C. § 1109(a), titled "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

52.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other equitable relief.

53.     ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part, that

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

54.     These fiduciary duties under ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

(a)     The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including, but not limited to, the mutual funds offered to participants through the Plan;

(b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)     The duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

55.     ERISA § 405(a), 29 U.S.C. § 1105(a), titled "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1)[, 29 U.S.C. § 1104(a)(1),] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

56.     Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of fiduciary duties, there may be, as in this case, several ERISA fiduciaries involved in a given issue.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party could

not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, one he had no connection with, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . .  [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 5080, 1974 WL 11542.

57.     Plaintiffs therefore bring this action in part under the authority of ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief under ERISA § 409(a), 29 U.S.C. § 1109(a), to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §§ 404(a)(1) & 405(a), 29 U.S.C. §§ 1104(a)(1) & 1105(a).

## VI.  DEFENDANTS' FIDUCIARY STATUS

58.     *Named Fiduciaries*.  ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

59.     *De facto Fiduciaries*.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

60.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

61.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).  Defendants further were required to avoid engaging in prohibited transactions under ERISA § 406, 29 U.S.C. § 1106, such as flagrant self-dealing.

A.     **NYSUT's, NYSUT Trust's, and the Individual Defendants' Fiduciary Status**

62.     NYSUT and NYSUT Trust are employee organizations pursuant to ERISA § 3(4), 29 U.S.C. § 1002(4), and functioned as the Plan Sponsor and Plan Administrator.  ERISA § 3(16), 29 § U.S.C. 1002(16).  NYSUT and NYSUT Trust also were Plan fiduciaries based on their substantial involvement in the operation, administration, and management of the Plan.

63.     NYSUT Trust was established by NYSUT as a non-profit trust to operate for the benefit of NYSUT members.  NYSUT Trust was established to provide certain benefits directly, to negotiate with vendors on behalf of NYSUT members for other benefit programs, including

the Plan, and to endorse and monitor benefits programs made available to NYSUT members, including programs such as the Plan.

64.     NYSUT Trust is an arm of NYSUT, and functioned on behalf of NYSUT and as its agent thereof with respect to its involvement in the Plan.

65.     NYSUT and NYSUT Trust functioned as fiduciaries under ERISA by participating in the management and administration of the Plan and Plan assets in a variety of respects. NYSUT and NYSUT Trust exclusively endorsed the Plan, and worked closely with ING to market, promote, and administer the Plan. NYSUT and NYSUT Trust also participated in the selection of investments offered in the Plan through its purported periodic analysis of Plan investment options in order to ensure that participants "have the correct investment opportunity in relation to their capacity risk [sic] and expected return." Exhibit 1.

66.     NYSUT and NYSUT Trust also communicated directly with Plan participants regarding the Plan and Plan assets; such communications constituted fiduciary acts under ERISA. NYSUT and NYSUT Trust assured NYSUT members that they could rely on NYSUT Trust to perform its functions for their benefit. For example, brochures created by NYSUT Trust to describe its endorsed products assured prospective investors that "we've done all the background work, so you don't have to!", and "you needn't spend a lot of time searching for quality insurance and investments. We already did." Exhibit 2. One brochure vouched that every "program endorsed by NYSUT Trust is researched, designed and monitored to ensure it will enhance your lifestyle. . . . When you participate in a NYSUT benefit program, NYSUT acts as your advocate to ensure that you receive satisfaction." Exhibit 3.

67.     Indeed, materials provided to NYSUT members by NYSUT, NYSUT Trust, and ING touted NYSUT's endorsement and oversight of the Plan. For example, one pamphlet

distributed by Aetna explained: "Opportunity Plus is a variable Tax-Deferred Annuity (TDA) that is breaking ground in the annuity industry. Working closely with New York State United Teachers (NYSUT), Aetna . . . has designed Opportunity Plus specifically for you." Exhibit 4. The same pamphlet stated: "Aetna Financial Services has a history of working with NYSUT Member Benefits to offer smart solutions for its members' financial goals." *Id.*

68.   As a result of the above described conduct, NYSUT and NYSUT Trust functioned as fiduciaries for the Plan because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority and control respecting management or disposition of Plan assets, and had discretionary authority or discretionary responsibility in the administration of the Plan. ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

69.   Furthermore, as the individuals responsible for oversight, governance and management of NYSUT Trust, the Individual Defendants acted on behalf of the NYSUT Trust, and, in that respect, are ERISA fiduciaries pursuant to ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

**B.    ING's Fiduciary Status**

70.   ING participated in the administration of the Plan and exercised a variety of fiduciary powers. ING held and controlled Plan assets, selected Plan investment options, changed Plan investment options, and, generally, managed and administered the Plan on a day-to-day basis. In addition, ING communicated with Plan participants regarding the Plan and Plan assets through marketing and promotional materials, prospectuses, account statements, and other materials provided directly to Plan participants specifically with respect to Plan assets.

71.   As a result of the above described conduct, ING functioned as a fiduciary for the Plan because it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority and control respecting management or disposition of Plan assets,

and had discretionary authority or discretionary responsibility in the administration of the Plan. ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

## VII.  DEFENDANTS' IMPROPER CONDUCT

**A.     NYSUT, NYSUT Trust, and ING Breached their Duties of Prudence and Loyalty through their Exclusive Endorsement Scheme**

72.     In 1988, NYSUT and NYSUT Trust exclusively endorsed Aetna's section 403(b) annuity product which allowed for investments in both variable funds and a fixed income account.  In connection with this endorsement, Aetna agreed to pay an expense reimbursement that initially approximated $40,000 a year.[1]  NYSUT and NYSUT Trust expected, and indeed, intended that the NYSUT name would give a significant sales advantage to Aetna—the endorsed vendor—allowing Aetna, and subsequently ING, to capitalize on the sense of security and trust generated by the endorsement.[2]

73.     The Plan was first offered to NYSUT members in June 1989.  After approximately five years, over 26,000 NYSUT members had enrolled and held a total investment in the Plan of approximately $735 million.  After ten years, enrollment had increased to over 40,000 members, and total investment to over $2 billion.  On information and belief, today more than 53,000 current and retired NYSUT members participate in the Plan, with total investments exceeding $2.3 billion.

74.     In 1994, Aetna increased the endorsement fee paid to NYSUT Trust ten-fold, to $400,000.  In 2001, NYSUT Trust and ING agreed to an annual payment schedule, beginning at

---

[1] On December 13, 2000, ING became the successor entity to Aetna Life Insurance and Annuity Company ("Aetna").

[2] The details of the endorsement scheme and the involvement of NYSUT and NYSUT Trust in the operation and administration of the Plan are set forth in, among other doucments, the various agreements executed by NYSUT Trust and Aetna/ING. *See, e.g.* Exhibits 5, 10.

$1,852,000 in 2001, and increasing to $2,402,000 in 2006. ING agreed to make additional payments commencing in 2005 based on the amount of NYSUT member assets invested in ING products. Later, the fee structure was changed to a per capita amount of $6 for each participating NYSUT member in 2005 increasing annually to $8.50 per member in 2009 (expected to yield over $4.2 million).

75.    NYSUT Trust was incentivized by the endorsement payments to expand Aetna and ING's business in conflict with the interests of its members. For instance, in 1994, Aetna and NYSUT Trust began offering a program called Financial Building Blocks to provide workshops on a variety of topics to NYSUT members. ING advertised Financial Building Blocks seminars as a source of neutral investment information for NYSUT members: "There's no sales pitch – they do not promote specific products or services." Exhibit 6. Internally, however, ING viewed the seminars as a "foot in the door" to promote its products to NYSUT members. NYSUT Trust itself attempted to obscure the role that ING played in Financial Building Blocks; an email to all NYSUT Trust employees dated February 5, 2001, instructed them to route calls about the program to ING (then Aetna) employees who would not identify themselves as such over the phone:

> Please make a note of the following: *When we get calls for Financial Building Blocks, please transfer them directly to [two Aetna employees].*
>
> The reason is that everyone else over in Aetna answers the phone 'ING-Aetna,' and we say FBB is NYSUT's program with no sales agenda. We don't want the local leaders to get the wrong idea right off the bat. [The two Aetna employees] answer the phones with their names, not Aetna.

Exhibit 7 (emphasis in original).

76.    In 1998, a new Aetna Financial Counseling Program ("FCP") to be conducted by Ernst & Young ("E&Y") was offered to NYSUT members. In promotional materials, NYSUT Trust described this program as providing an "independent review" and offering unbiased

advice. *See* Exhibit 8 . In fact, however, according to internal ING documents, the "initial

purpose of the FCP program was to generate 403(b) leads for the Opp. Plus Producer." Exhibit

9. In addition, ING representatives capitalized on the FCP to sell NYSUT members a variety of

other products beyond the Plan, including long-term care insurance, term life insurance, Roth

IRAs, and medical insurance. The agreement that governed the FCP reflected the program's

purpose as a business generation engine for ING (then Aetna):

> Aetna's Representatives will be the only persons Members will be referred
> to for individualized financial planning services pursuant to the [Plan].
> All requests from Members who participate in the [Plan] for
> individualized financial planning services will be referred to Aetna or its
> Representatives. The Trust will instruct E&Y to refer Members who need
> or desire financial planning services to Aetna or its Representatives.

Exhibit 5.

77.     In 2001, NYSUT Trust hired six financial services coordinators to act as a liaison

between ING and NYSUT Trust and to oversee the ING programs and services sponsored by the

NYSUT Trust, including the Plan. While these coordinators were NYSUT Trust employees, in

fact the coordinators' salaries were paid entirely by ING. *See* Exhibit 10.

78.     Contrary to what they told NYSUT members, the coordinators supported ING in

its sales efforts, even accompanying ING sales agents to conferences where ING marketed its

products and presenting sales leads to ING. For example, following a conference, one

coordinator wrote to alert an ING sales representative, with a copy to an ING regional manager,

about a potential lead:

> Just a heads up . . . the president [of a local union] will probably be calling
> you next week. He has gotten a few requests from his members for more
> information about the financial planning you discussed at [a conference]
>
> *See* . . . someone actually was listening!

Exhibit 11.

79.    The ING regional sales manager responded:

you bet ......$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$$.

Exhibit 11.

80.    A review by another ING employee captures the extent to which ING and

NYSUT plied their exclusive endorsement arrangement to promote ING's products:

A case in point . . . was a recent deal that was done in Chappaqua. The
union president wanted no mention of specific product or company, etc.
[The coordinator] used a nice soft selling approach and somebody in the
audience was finally baited to ask why this [sic] NYSUT approved ING
and as a result we have an exclusive. A soft sell that worked very well.
He has done this approach in many other places. . . .

Exhibit 12.

81.    NYSUT Trust used only a portion of the endorsement payments to pay for

additional account "enhancements" that were offered to Plan participants but not to other

NYSUT members. In 1992, for example, NYSUT Trust began to allow investors to automate

their monthly withdrawals. In 1994, NYSUT Trust started offering Plan participants insurance

that would cover $500 of a member's contributions in the event of disability, as well as sliding

scale life insurance with an option to purchase further protection. In 1996, NYSUT Trust also

began to offer free financial counseling for the families of deceased Plan participants.

82.    These features proved of little use to the vast majority of Plan participants.

During the year spanning from September 1, 2004, through August 31, 2005, only 297 investors

(out of more than 50,000) called the financial hotline. A mere eleven members (or their spouses)

received the counseling for ill or deceased investors. Just 32 members received the $10,000 life

insurance payout. And the legal services plan produced only 587 simple wills, 213 healthcare

proxies, and 155 letters. The total direct cost to NYSUT Trust of all these benefits (not including

overhead) was $1,067,000, less than one-half of what the NYSUT Trust received from ING

during the same period.  On the other hand, NYSUT members paid ING over $12,000,000 in Mortality & Expense fees and approximately the same amount in mutual fund and other investment costs during these twelve months.  Thus, in the course of one year, NYSUT members paid about $24 million to ING, and they received "enhancements" costing about $1 million. Approximately $21.3 million was retained by ING, and approximately $1.66 million was retained by NYSUT Trust.  The funds retained by NYSUT Trust went into the NYSUT Trust's overhead, certain other costs associated with the Plan, and a pool of excess cash, controlled by NYSUT Trust, that grew to $5.5 million by August 2005.

83.    At no point during the Class Period did NYSUT, NYSUT Trust, or ING fully, fairly or adequately explain to Plan participants the compensation that NYSUT Trust received in order to exclusively endorse the Plan, nor the financial incentive that NYSUT Trust had to help ING sell the Plan.  Whereas the Plan was billed as being in the best interests of Plan participants, in fact, NYSUT Trust and ING used the Plan to serve their own best interests at the expense of Plan participants and beneficiaries.  NYSUT, NYSUT Trust, and ING flagrantly abused their position of trust and their duties as Plan fiduciaries and in so doing caused the Plan and Plan participants to incur excessive fees and investment losses caused by Defendants' imprudent and disloyal actions.  Prudent, loyal Plan fiduciaries would have actively monitored the Plan in order to ensure that it was operating in the best interests of Plan participants.  Here, on the other hand, Defendants operated the Plan in a manner to maximize their financial benefits regardless of the impact on Plan participants' retirement savings.

**B.     Defendants Breached their Fiduciary Duties under ERISA by Charging Excessive Fees and Failing to Adequately Monitor the Plan to Ensure that it was in the Best Interests of Plan Participants**

84.     Under ERISA, fiduciaries are required to operate plans in the best interests of participants for the exclusive purpose of providing retirement benefits.   As the DOL has made clear in advisory opinions and other publications, to do so, plan fiduciaries must:

- Establish a prudent process for selecting investment alternatives and service providers;

- Ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the level and quality of services provided;

- Select investment alternatives that are prudent and adequately diversified;

- Monitor investment alternatives and service providers once selected to see that they continue to be appropriate choices.

85.     Here, Defendants failed to ensure that the fees paid with Plan assets were reasonable and for necessary services.   Throughout the Class Period, there were equally good or better, lower cost section 403(b) alternatives to the Plan.

86.     Since its inception in 1989, investors in the Plan have been charged every year both for expenses and an insurance charge, a so-called Mortality and Expense ("M&E") Fee, on their variable fund investments.   A fixed-income option, in which assets are invested in ING's General Account, carries no M&E fees, though the fees charged to the fixed-income option also were in and of themselves excessive, particularly in light of the modest return guaranteed by the fixed-income option.   The current M&E fee is 1% of each retirement account's variable fund balance, and the average variable fund cost (based on disclosed fees) is 0.68%.   Thus, the average combined annual charge is 1.68%.   The percentage is even higher when other fees and

expenses are taken into account, including the Administrative Expense Charge, an annual charge on each anniversary of each Individual Account, and a "Surrender Charge" if a Plan participant withdraws his or her investments from ING within a specified number of years after contract inception.

87.     In 1998, NYSUT Trust—which had a financial stake in the total amount invested by NYSUT members—asked ING to take steps to retain teachers with large account balances who wanted to shift to cheaper plans. ING offered such individuals "a free consultation with an Aetna planner" as an inducement to stay. *See* Exhibit 13. When members continued to switch, NYSUT Trust asked ING in 2000 to create a cheaper alternative product to "assist in retaining the 5%–6% of assets that [were] being lost to lower cost competitors each year." Exhibit 14. As a result, a section 403(b) plan called "Opportunity Independence" was created offering direct access to mutual funds without insurance charges. Opportunity Independence investors therefore avoided Mortality and Expense fees; but they were charged a 0.40% "Administration Fee" in addition to the applicable fund expenses. The mutual funds and other investment options available through Opportunity Independence were, in some instances, more expensive than those offered in the Opportunity Plus program. For example, Opportunity Independence—supposedly a low cost alternative—offered an S&P 500 index fund with an expense ratio of 0.93%, even though an S&P 500 index fund costing 0.10% was offered in Opportunity Plus. Hence, even when purportedly selecting lower cost options, ING failed to ensure that the fees paid from Plan assets were reasonable.

88.     The impact of excessive retirement plan fees is well known in the industry. In the November 2006 report by the Government Accountability Office ("GAO") regarding 401(k) plan fees, *Private Pensions Changes Needed to Provide 401(k) Plan Participants and the*

*Department of Labor Better Information on Fees* ("GAO Fees Report"), the GAO described the

impact that excessive fees have on retirement savings:

> Over the course of the employee's career, fees may significantly decrease retirement savings. For example, a 1-percentage point difference in fees can significantly reduce the amount of money saved for retirement. Assume an employee of 45 years of age with 20 years until retirement changes employers and leaves $20,000 in a 401(k) account until retirement. If the average annual net is 6.5 percent—a 7 percent investment return minus a 0.5 percent charge for fees—the $20,000 will grow to about $70,500 at retirement. However, if fees are instead 1.5 percent annually, the average net return is reduced to 5.5 percent, and the $20,000 will grow to only about $58,400. The additional 1 percent annual charge for fees would reduce the account balance at retirement by about 17 percent.

GAO Fees Report at 7, available at *http://www.gao.gov/new.items/d0721.pdf.*

89.     Thus, here, as a result of Defendants' failure to prudently and loyally manage

Plan assets and ensure that fees paid from Plan accounts were reasonable, Plan participants'

retirement savings have been substantially diminished.

90.     All told, the Plan fiduciaries essentially made no effort to ensure that the Plan was

only charged reasonable fees, and instead focused on maximizing the profit Defendants could

make from Plan participants.

91.     By failing to ensure that fees paid from Plan assets were reasonable, Defendants

breached their fiduciary duties under ERISA.

92.     An adequate investigation by an impartial fiduciary would have revealed that the

fees charged to Plan participants were unreasonable and the investment options selected by the

Defendants were not in the Plan participants' best interests.

**C.     ING Engaged in an Improper Revenue Sharing Kickback Scheme with Investment Advisors**

93.     Under the Plan, ING is responsible for selecting the different mutual fund and

investment options offered to Plan participants. ING controls this process in all respects. It

selects options to offer and has the authority to add or remove options at its discretion. NYSUT Trust, an arm of NYSUT, retained the authority to periodically evaluate the investment options in order to ensure that investment options were appropriate for NYSUT members.

94.     Technically, Plan participants in the group annuity contracts did not invest directly in the mutual funds and other investment options ING selected. Rather, they invested in a "Separate Account" established by ING. The Separate Account established by ING kept its assets separate from the general assets of ING and was not chargeable with any of ING's liabilities outside of the Separate Account.

95.     The Separate Account was divided into sub-accounts that corresponded to the mutual funds and other investment options available under the annuity contracts. Pursuant to the contracts, Plan participants chose (from the available options) the investments in which their contributions were invested and ING allocated those contributions to the particular sub-accounts within the Separate Account which corresponded to the chosen investment options. In return for their contributions, participants received accumulation units (shares) of the Separate Account, which accumulation units were held by ING ("Accumulation Units"). In this respect, the Separate Account was like a mutual fund. When people invest in a mutual fund, they own shares of the mutual fund; they do not have an ownership interest in the underlying stocks owned by the mutual fund.

96.     Based on the combined contributions to the sub-accounts made by the Plan participants, ING sold and purchased mutual fund or other investment shares to hold in the Separate Account. The value of a Plan participant's Accumulation Units in the Separate Account fluctuated based upon the value of the shares held within the various sub-accounts.

97.     Mutual funds generally do not have employees and must contract with various entities to perform managerial, administrative, accounting, legal, and other services. Mutual funds pay the entities providing those services. Mutual funds pass those costs on to their investors by charging them a variety of fees, typically investment management fees, distribution fees or commissions, and marketing or 12(b)(1) fees. A mutual fund takes these fees from investors by paying to the investment manager, mutual fund advisor, or other service provider out of its general assets a dollar amount equal to the designated percentage of the net asset value of all of its shares, which causes the net asset value of all its shares to decrease by that percentage. Thus, here, this caused the value of the mutual fund shares held by ING in the Separate Account to decrease by that percentage, which in turn reduced the value of each Plan participant's Accumulation Units of the Separate Account correspondingly.

98.     Despite its special relationship to NYSUT members as the exclusively endorsed 403(b) annuity provider and its status as an ERISA fiduciary, ING implemented and maintained a scheme whereby Investment Advisors made revenue sharing payments (*e.g.*, kickbacks) to ING based upon a percentage of the Plan participants' assets invested in the mutual funds or other investments through ING. Upon information and belief, payment of the kickbacks became a condition to including a mutual fund family's funds in the platform of investments offered to Plan participants.

99.     While, as noted above, the revenue sharing payments were calculated as a percentage of Plan participants' assets invested in the mutual funds or other investments through ING, the payments bore no relationship whatsoever to the cost of providing the services or a reasonable fair market value for the services. Simply put, whether a participant had $10,000 or $100,000 in his or her account, the cost to handle transactions and maintain records was the

same. Furthermore, the provision of these services was an inherent part of ING's business, such that the services provided by ING actually had no reasonable fair market value at all. Indeed, upon information and belief, prior to its implementation of the revenue sharing kickback scheme, ING provided the same services to the Investment Advisors free of charge.

100.    While ING may describe the revenue sharing payments as payments for services of one kind or another provided to the Investment Advisors, this is merely a ruse. At best, any services provided were nominal and the payments, which were substantial, far exceeded reasonable compensation for those services. In reality, the Investment Advisors were not paying ING for the performance of services—rather they were paying ING to include their funds in the Plan. ING has thus both misused Plan participants' assets and mismanaged the assets by selecting investment options based on revenue sharing kickbacks as opposed to a prudent evaluation of the merits of the options. Based on ING's revenue sharing kickback scheme, ING chose expensive funds that paid it a kickback rather than comparable (or better) performing lower cost options.

101.    The revenue sharing payments received by ING were inappropriate for another fundamental reason: participants bore the cost of the kickback scheme. This is because the Investment Advisors who participated in ING's revenue sharing scheme covered the cost of the revenue sharing by increasing the fees charged to Plan participants' Separate Accounts. Thus, Plan participants both paid for and suffered the consequences of ING's revenue sharing kickback scheme.

102.    Plan fiduciaries have a fiduciary obligation to ensure that fees and expenses that the Plan incurs are reasonable for the services provided and incurred for the sole benefit of Plan participants and beneficiaries. By choosing mutual funds and other investments based on the

payment of revenue sharing kickbacks as opposed to the prudent evaluation of the merits of the fund as a Plan investment option, ING breached its fiduciary obligations. In addition, by using Plan assets for its own benefit, and by engaging in transactions dealing with Plan assets with parties in interest, ING engaged in prohibited transactions under ERISA.

**D.   Defendants Failed to Provide Complete and Accurate Information to Plan Participants Regarding Endorsement Fees Paid to NYSUT Trust and Revenue Sharing Kickback Fees Paid to ING**

103.   In the course of its management and administration of the Plan, Defendants had an ongoing fiduciary obligation to provide Plan participants with information that they knew or should have known was critical to the Plan participants' making informed decisions regarding the Plan and Plan investments. Contrary to this responsibility, Defendants failed to provide complete and accurate information regarding the relationship between NYSUT Trust and ING.

104.   Originally, Aetna did not make any disclosure at all regarding its financial arrangements with NYSUT Trust. From June 1989 through November 1992, the Aetna prospectus for Opportunity Plus stated only that "Opportunity Plus is endorsed by [NYSUT] and [the NYSUT Trust]. Exhibit 15. Subsequently, Aetna and ING prospectus disclosures referred to payments to the NYSUT Trust, but never disclosed that the payments were used to market the Plan to teachers. Similarly, disclosures made reference to ING's contribution to the costs incurred by NYSUT Trust for retaining coordinators "who assist in the management of the Opportunity Plus program," but failed to reveal that, in fact, ING paid the coordinators' salaries, and that the Coordinators were actively involved in marketing the Plan and other ING products to NYSUT members.

105.   In 2001, ING proposed changing Opportunity Plus marketing disclosure language to read: "All fees and expenses associated with Opportunity Plus *including those received by NYSUT Benefit Trust* are detailed in the current prospectus, which should be read carefully prior

to investing or sending money." *See* Exhibit 16 (emphasis added). Thereafter, NYSUT's then-Executive Director of Finance and Administration wrote to ING to request that the language in bold above be removed. He argued:

> The issue, as I'm sure you can understand, is that [the NYSUT Trust] does not want to advertise the financial arrangement between ING and NYSUT Benefit Trust to our competition. This is exactly what will happen, as they will use this information against us to persuade potential participants against our program. In addition, the ING type of disclosure on work site posters could create political problems for our local presidents. We need the support of local presidents in order to properly market this program. As you can well imagine, competition is fierce in New York State school districts. It is our position that the expense reimbursement arrangement should be disclosed to participants only in the prospectus. This matter must be resolved in order to resume more active marketing and promotion of our program. Millions of dollars are being lost to our competition each day that this matter is allowed to go unresolved.

*See* Exhibit 16.

106.   ING ultimately agreed to compromise and proposed that the new disclosure language read as follows:

> Opportunity Plus is a tax deferred variable annuity issued by [Aetna/ING]. . . . All fees and expenses associated with [Opportunity Plus], including those of the Trust, are detailed in the current prospectuses, . . . which should be read carefully prior to investing or sending money.

*See* Exhibit 17.

107.   NYSUT Trust's Director approved this compromise language in an internal email, noting its obfuscating quality: "I think this lang. is even better. It makes you think that the expenses they are talking about are the expense [*sic*] of the ING National Trust." Exhibit 17.

108.   Similarly, in 2004, a coordinator objected to prospectus disclosure of the per capita fee to be paid by ING to NYSUT Trust:

> I am hesitate [*sic*] to have the prospectus outline a reimbursement per Opp+ client. I know that myself and most likely the other financial coordinators and probably others, often pitch ING as an exclusive carrier of employer monies. We also have a role in assisting ING in school

Districts that ING may be having difficulty with. I am often asked or simply bring up myself, that neither NYSUT nor myself receive extra money from ING should a local choose to use them as an exclusive carrier. Same goes when were [*sic*] assisting with access. Should the prospectus outline a dollar amount reimbursement based on the number of Opp+ clients, we can no longer state that, and I feel that we lose some of our objectivity. I can certainly see us using that as an "off the books" formula in determining the dollar amount, but would prefer not to have it in the prospectus.

Exhibit 18.

109.   By failing to provide complete and accurate information regarding NYSUT Trust and ING's relationship, Defendants intentionally breached their fiduciary duties under ERISA.

## VIII.  CAUSES OF ACTION

### Count I:

### (Failure to Prudently and Loyally Manage Plan Assets in Violation of ERISA § 404(a)(1))

110.   Plaintiffs incorporate herein the allegations set forth above.

111.   As alleged above, NYSUT and NYSUT Trust are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because of their discretionary authority, control, and responsibility with respect to the Plan and Plan assets through, *inter alia*, their endorsement of the Plan, involvement in the review of Plan investment options, and extensive communications with Plan participants regarding the Plan and Plan assets. In addition, as the individuals responsible for oversight, governance and management of the NYSUT Trust, and, thus, who operated on behalf of the NYSUT Trust in carrying out its fiduciary duties to the Plan, the Individual Defendants also functioned as fiduciaries pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

112.   ING is a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because of its discretionary authority and responsibility with respect to the administration of the Plan and authority and control of Plan assets, through, *inter alia*, its

management and administration of the Plan on a day-to-day basis, selection of Plan investment options, communications with participants regarding the Plan and Plan assets, and control of Plan assets in participants' separate accounts and in its own general account.

113.    As fiduciaries, Defendants were bound by the duties of loyalty, exclusive purpose and prudence pursuant to ERISA §§ 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B).

114.    Here, Defendants breached these duties in a variety of respects.  Specifically, NYSUT, NYSUT Trust, and the Individual Defendants breached their fiduciary duties by, *inter alia*:

(a)    Failing to adequately investigate, and evaluate the Plan before endorsing it exclusively as the 403(b) investment program for NYSUT members;

(b)    Endorsing the Plan exclusively for NYSUT members when they knew, or, in the exercise of reasonable care should have known, that the expenses of the Plan were substantially higher than those of equivalent products available in the marketplace;

(c)    Accepting substantial endorsement fees from ING, failing to use such fees to defray the reasonable costs of administering the Plan, and by putting their own pecuniary interests ahead of the NYSUT members in this regard;

(d)    Actively promoting ING's interests to the detriment of NYSUT members, including Plan participants and their beneficiaries; and

(e)    Failing in any manner to remedy the conflicts of interest they possessed with respect to Plan participants as a result of ING's payment of millions of dollars to NYSUT Trust to endorse, support, promote, and expand the Plan.

115.    ING breached its fiduciary duties of loyalty, exclusive purpose and prudence by, *inter alia*:

(a)   Paying substantial endorsement fees to NYSUT Trust as the *quid pro quo* for NYSUT Trust's endorsement of the Plan;

(b)   Charging unreasonable and excessive fees for administering the Plan;

(c)   Selecting investment options based on revenue sharing kickbacks paid to ING by Investment Advisors as opposed to based on a prudent evaluation of the merits of the investments, which constituted disloyal self-dealing;

(d)   Taking for its own use and gain revenue sharing kickback payments despite the fact that such payments were Plan assets that ING was required to manage and maintain for the exclusive benefit of the Plan participants;

(e)   Causing Plan participants to bear the costs of the revenue sharing kickback scheme through increased fees charged to Plan accounts by Investment Advisors even though Plan participants received no benefit from the scheme and, to the contrary, suffered substantial losses because of it;

(f)   Actively promoting its own financial interests to the detriment of NYSUT members when dealing with members of NYSUT Trust; and

(g)   Failing in any manner to remedy the conflict of interest it possessed with respect to Plan participants as a result of (1) the millions of dollars of payments it made to NYSUT Trust to endorse the Plan, and (2) revenue sharing kickback payments it received from Investment Advisors.

116.   An adequate investigation by any of the Defendants would have revealed to a reasonable fiduciary that the Plan was operated in a manner that was not in the best interests of Plan participants, and that Defendants were acting imprudently, disloyally, and not for the exclusive purpose of providing retirement benefits to Plan participants and their beneficiaries.

117.    As a direct and proximate result of these breaches of fiduciary duty by Defendants, the Class suffered damages in the tens of millions of dollars.

118.    Pursuant to ERISA §§ 409 & 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## Count II:

### (Failure to Provide Complete and Accurate Information in Violation of ERISA § 404(a)(1))

119.    Plaintiffs incorporate herein the allegations set forth above.

120.    This Count alleges fiduciary breach against all Defendants.

121.    As alleged above, during the Class Period Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

122.    As further alleged above, Defendants communicated extensively with Plan participants regarding the Plan and Plan assets, which is an act of Plan administration, and, thus, were fiduciaries in this respect.

123.    The duty of loyalty under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires fiduciaries to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's

investment options such that participants can make informed decisions with regard to participation in the Plan, and investment options available under the Plan.

124. Defendants breached their ERISA duty to inform participants by failing to provide complete and accurate information regarding the Plan.

125. Specifically, NYSUT, NYSUT Trust, and the Individual Defendants breached their duty to inform by:

(a) Failing to provide complete and accurate information to Plan participants regarding their endorsement of the Plan, the amount paid to NYSUT Trust by ING for the endorsement, the financial incentives that NYSUT Trust had to maintain and increase participant participation in the Plan, and other financial support paid to NYSUT Trust by ING;

(b) Failing to disclose to Plan participants the conflicts of interest that NYSUT Trust had as a result of the financial incentives and other financial support paid to it by ING; and

(c) Failing to disclose to Plan participants that its endorsement of the Plan was the result of compensation paid to NYSUT Trust and not an evaluation of the Plan on the merits based on whether it was in the best interests of Plan participants.

126. ING breached its ERISA duty to inform by:

(a) Failing to provide complete and accurate information to Plan participants regarding NYSUT Trust's endorsement of the Plan, the amount paid to NYSUT Trust by ING for the endorsement, the financial incentives that NYSUT Trust had to maintain and increase participant participation in the Plan, and other financial support paid to NYSUT Trust by ING;

(b) Failing to disclose to Plan participants the conflicts of interest that NYSUT Trust had as a result of the financial incentives and other financial support paid to it by ING;

(c)     Failing to fully, fairly, or adequately disclose to Plan participants its revenue sharing kickback scheme with Investment Advisors whereby ING received and retained for its own account revenue sharing payments from Investment Advisors;

(d)     Failing to disclose that it selected investment options based on revenue sharing kickbacks as opposed to objective evaluation of the merits of the options; and

(e)     Failing to disclose to Plan participants that, notwithstanding its extensive marketing directly to NYSUT members touting the benefits of the Plan, the Plan was not operated for the exclusive purpose of providing retirement benefits to Plan participants, was substantially more expensive than other readily available comparable plans that were not endorsed by NYSUT, and, thus, that the Plan was not in Plan participants' best interests.

127.   As a consequence of the failure of Defendants to satisfy their duty to provide complete and accurate information under ERISA, Plan participants lacked sufficient information to make informed choices regarding the investment of their retirement savings in the Plan.

128.   Defendants' failure to provide complete and accurate information regarding the Plan was uniform and Plan-wide, and impacted all Plan participants the same way in that none of the Plan participants received crucial, material information regarding the NYSUT Trust's endorsement of the Plan, and details pertaining thereto, or ING's revenue sharing arrangement with Investment Advisors.

129.   As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the

Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

130.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## Count III:

### (Prohibited Transactions Pursuant to ERISA §§ 406(a)(1) and 406(b)(1) & (b)(3))

131.   Plaintiffs incorporate herein the allegations set forth above.

132.   As alleged above, during the Class Period ING was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). ING also was a party in interest as that term is defined in ERISA § 3(14), 29 U.S.C. § 1002(14), in that it was a fiduciary, and it provided services to the Plan. Also as alleged above, during the Class Period NYSUT Trust was a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). NYSUT Trust also was a party in interest as that term is defined in ERISA § 3(14), 29 U.S.C. § 1002(14), in that it was a fiduciary and an employee organization whose members participated in the Plan. As such, ING and NYSUT Trust were subject to the prohibited transactions provisions of ERISA and the regulations pertaining thereto.

133.   Pursuant to ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), it is prohibited for fiduciaries to use their authority over plan assets to cause themselves to receive a benefit. Thus, if the Plan sponsor or other fiduciary used its authority to place Plan assets with an Investment Advisor who returned the favor through the payment of any benefit, a prohibited transaction occurred. It also is a prohibited transaction for a plan fiduciary to receive compensation for his

own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.  ERISA § 406(b)(3), 29 U.S.C. § 1106(b(3).

134.    The Plan accounts and the retirement savings invested therein are Plan assets.  In addition, the revenue sharing payments received by ING from Investment Advisors are themselves Plan assets:  ING received and held the revenue sharing payments as a result of its status as a fiduciary or its exercise of fiduciary discretion, control, or authority, and at the expense of Plan participants or beneficiaries.  To wit, ING received payments from Investment Advisors in exchange for offering their funds as an investment option to the Plan participants, and the fees charged to the Plan accounts by the Investment Advisors covered not only the fees they would have normally charged, but also the amount of the revenue-sharing payments they had to make to ING.  In addition, the revenue sharing payments came at the expense of Plan participants in that in exchange for the payments, ING selected funds that were far more expensive than other readily available comparable funds.

135.    ING engaged in prohibited transactions pursuant to ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with Plan assets in its own interest and for its own account. Specifically, ING improperly used Plan assets to generate revenue sharing payments and retained for its own use revenue sharing payments it received from Investment Advisors.

136.    ING engaged in prohibited transactions pursuant to ERISA § 406(b)(1) & (3), 29 U.S.C. § 1106 (b)(1) & (3), by receiving compensation for its own personal account from a party dealing with the Plan in connection with a transaction involving the assets of the Plan. Specifically, the revenue sharing payments constituted compensation from a party dealing with the Plan (Investment Advisors) in connection with a transaction (the purported provision of services to the Plan by the Investment Advisors) involving Plan assets (the shares held in Plan

accounts on which the revenue sharing was based and which bore the costs of the payments directly or indirectly).

137.    Because ING used its fiduciary authority, control, and responsibility to select investment options and received substantial payments for doing so that far exceeded what could possibly be considered reasonable compensation for the provision of any actual services to the Plan, ING engaged in prohibited transactions pursuant to ERISA §§ 406(b)(1) & (3), 29 U.S.C. §§ 1106(b)(1) & (3).  ING's direct pecuniary interest in its transactions with the Investment Advisors compromised its exercise of its best judgment as a fiduciary.

138.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), prohibits fiduciaries from engaging in a transaction if they know or should know that it constitutes, *inter alia*, the use by or for the benefit of a party in interest of any assets of the Plan.  Here, ING engaged in prohibited transactions in violation of this provision by using Plan assets in order to obtain revenue sharing which was a benefit for itself, a party in interest.  ING also breached this provision by charging excessive fees to the Plan for the services that it provided, including, by way of example, excessive M&E fees.

139.    ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), provides an exemption from the prohibitions of ERISA § 406(a), 29 U.S.C. § 1106(a), for contracting or making reasonable arrangements with a party in interest for, *inter alia*, services necessary for the establishment or operation of the plan, *if no more than reasonable compensation is paid*.  Here, this exemption does not apply.  The value of the services that ING purportedly provided to the Investment Advisors in exchange for the revenue sharing payments was nominal at best, and yet, the payments were substantial.  Similarly, ING charged excessive fees to the Plan that exceeded reasonable compensation for the services that it provided.  Accordingly, ING's conduct in

obtaining and retaining for its own use the revenue sharing payments, and charging excessive fees to the Plan constituted prohibited transactions under ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

140.    NYSUT Trust engaged in prohibited transactions pursuant to ERISA §§ 406(b)(1) and (3), 29 U.S.C. §§ 1106(b)(1) & (3).  As set forth above, ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits a fiduciary from receiving compensation from a party dealing with a plan in connection with a transaction involving the assets of the plan.

141.    Here, NYSUT Trust was compensated by ING, a party dealing with the Plan, for exclusively endorsing the Plan.  The compensation was in connection with a transaction involving the assets of the Plan in that (1) the endorsement arrangement was itself a transaction involving the assets of the Plan; and (2) the amount of the compensation was based on Plan assets.

142.    NYSUT Trust used its authority, control, and responsibility, which made it a fiduciary, to endorse the services provided by ING to Plan participants.  NYSUT Trust had an interest in the transactions that affected its exercise of its best judgment as a fiduciary.  Accordingly, NYSUT Trust engaged in prohibited transactions under ERISA §§ 406(b)(1) and (3), 29 U.S.C. §§ 1106(b)(1) & (3).

143.    By engaging in prohibited transactions, Defendants breached their fiduciary duties under ERISA and caused the Plan to incur millions of dollars of losses.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

144.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) & 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate. Such relief includes: (a) relief for losses incurred by the Plan as a result of paying excessive fees to ING; (b) relief for losses incurred as a result of investing in funds that were selected by ING based on revenue sharing as opposed to prudent evaluation of the merits of the funds; (c) disgorgement of excessive fees paid to ING; (d) disgorgement of revenue sharing payments retained by ING; (e) disgorgement of endorsement fees paid to NYSUT Trust by ING; and (f) such other relief that is just and proper under the circumstances.

## Count IV:

### (Liability Pursuant to ERISA § 405(a) Against All Defendants)

145.    Plaintiffs incorporate herein the allegations set forth above.

146.    As alleged above, during the Class Period Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because of their discretionary authority and responsibility with respect to the management and administration of the Plan and authority and control over Plan assets.

147.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he or she knows of such a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

148.    **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Defendants knew of breaches by the other

fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. Specifically, Defendants knew that ING paid NYSUT Trust to endorse the Plan; that the purpose of the endorsement was to help ING promote and market the Plan for its own financial gain; and accordingly that ING did not operate the Plan for the exclusive purpose of providing retirement benefits to Plan participants. Defendants also knew that none of them had provided complete and accurate information to Plan participants regarding NYSUT Trust's endorsement of the Plan and the financial incentives and support that ING paid to NYSUT Trust with respect to the Plan. Notwithstanding this knowledge, Defendants did not undertake any effort to remedy any of the breaches alleged herein.

149. **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. NYSUT, NYSUT Trust, and the Individual Defendants knowingly participated in ING's breaches of fiduciary duty with respect to the endorsement payments in that they knew of and benefited from the payments and sought, together with ING, to conceal the financial incentives and support that ING paid to NYSUT Trust. ING knowingly participated in NYSUT's, NYSUT Trust's, and the Individual Defendants' breaches of fiduciary duty pertaining to NYSUT Trust's receipt of the endorsement payments and incomplete disclosures pertaining thereto in that ING knew that the payments were made, that NYSUT's and NYSUT Trust's support of the Plan was the result of the payments, and that the disclosures made by NYSUT and NYSUT Trust failed to provide complete and accurate information regarding the Plan.

150.   **Enabling a Breach**.   ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

151.   Defendants enabled one another's breaches of fiduciary duty because their failure to provide complete and accurate information to the Plan participants enabled one another to commit the breaches of fiduciary duty alleged herein.   Had any of the Defendants faithfully discharged his or her duty to prudently manage and administer the Plan and provide complete and accurate information to Plan participants regarding the relationship between NYSUT and NYSUT Trust and ING, Plan participants could have protected themselves from the losses incurred by the Plan.

152.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, the Class, lost millions of dollars of retirement savings.

153.   Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) & 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## IX. CLASS ACTION ALLEGATIONS

154.   **Class Definition**.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

> Current or former NYSUT members (their heirs and/or beneficiaries) who participated in the Opportunity Plus 403(b) plan or the Independence Plus 403(b) plan at any time between June 1989 and December 31, 2006.

155.   **Class Period**. From June 1989, when the Opportunity Plus plan was first offered as the NYSUT endorsed 403(b) plan for NYSUT members through December 31, 2006, when the contract between NYSUT and ING was terminated.

156.   **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are more than 53,000 members of the Class.

157.   **Commonality**. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(b)   whether Defendants failed to provide complete and accurate information to Plan participants regarding NYSUT Trust's exclusive endorsement of the Plan in exchange for the payment of millions of dollars by ING and ING's revenue sharing scheme with Investment Advisors;

(c)   whether ING charged excessive fees for the services that it provided to the Plan;

(d)   whether Defendants engaged in prohibited transactions under ERISA; and

(e)   whether the members of the Class suffered losses and, if so, the proper measure of such losses.

158.   **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class because: (a) the conduct of Defendants giving rise to the claims is identical as to all

members of the Class; and (b) the losses suffered by the Plan, and, indirectly by Plan participants, are caused by Defendants Plan-wide breaches of fiduciary duty.

159.   **Adequacy**.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in ERISA class action litigation and complex class action litigation generally.   Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

160.   **Rule 23(b)(1)(B) Requirements**.   Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

161.   **Other Rule 23(b) Requirements**.   Class action status is also warranted under the other subsections of Fed. R. Civ. P. 23(b) because:   (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan

resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the Plan participants would have made if Defendants had fulfilled their fiduciary obligations;

     B.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty, and in connection therewith: (1) an Order requiring NYSUT Trust to disgorge the endorsement fees that it received from ING and pay such fees to the Plan; (2) an Order requiring ING to disgorge revenue sharing payments it received from Investment Advisors and to pay such payments to the Plan; and (3) an Order requiring ING to disgorge excessive fees charged to Plan accounts with respect to its management and administration of the Plan;

     C.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

     D.     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan;

     E.     An Order awarding actual damages in the amount of any losses the Plan suffered;

     F.     An Order awarding pre- and post-judgment interest based on the greatest of: (1) the Defendants' internal rates of return; (2) the Pension Benefit Guaranty Corporation's interest rates; or (3) statutory interest rates;

     G.     An Order awarding costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and other applicable laws or regulations;

     H.     An Order awarding attorneys' fees pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and the common fund doctrine;

I.      An Order for equitable restitution and other appropriate equitable and injunctive

relief against the Defendants; and

J.      Such other and further relief as to this Court may seem just and proper.

Dated: New York, NY
      March 28, 2007

Respectfully submitted,
ROSEN PREMINGER & BLOOM LLP

By: _____
    David S. Preminger (DP-1057)
    Rosen Preminger & Bloom LLP
    708 Third Avenue, Suite 1600
    New York, NY  10019
    Telephone:  (212) 682-1900
    Facsimile:  (212) 867-6878

    Lynn Lincoln Sarko (LS-3700)
    Derek W. Loeser (DL-6712)
    Amy Williams-Derry (AW-5891)
    KELLER ROHRBACK L.L.P.
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101
    Telephone:  (206) 623-1900

    Gary A. Gotto (GG-5640)
    KELLER ROHRBACK P.L.C.
    3101 North Central Avenue , Suite 1400
    Phoenix, AZ 85012
    Telephone:  (602) 248-0088

    Jeffrey C. Engerman (JE-3815)
    LAW OFFICES OF
     JEFFREY C. ENGERMAN, PC
    12400 Wilshire Boulevard, Seventh Floor
    Los Angeles, CA 90025
    Telephone:  (310) 207-7777

Allen C. Engerman (AE-6504)
LAW OFFICES OF
  ALLEN C. ENGERMAN, P.A.
Sanctuary Centre
4800 North Federal Highway, Suite 100-D
Boca Raton, FL 33431
Telephone:  (561) 392-2222

Edward Siedle (ES-8388)
79 Island Drive South
Ocean Ridge, FL 33435
Telephone:  (561) 202-0919

Denis J. Jean (DJ-4903)
1018 Jerome Road
Franklin Square
New York, NY 11010
Telephone:  (516) 837-3892